# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8481 | **DATE** | 7/29/2004 |
| **CASE TITLE** | Robin Johal vs. Little Lady Foods, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order granting in part and denying in part Defendant's Motion to Strike [doc. # 36-1] and granting the Defendant's motion for summary judgment [19-1 & 23-1].

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | 40 |
| | Notified counsel by telephone. | JUL 30 2004 | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| DL | courtroom deputy's initials | 2004 JUL 29 PM 6: 30 U.S. DISTRICT COURT CLERK | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

ROBIN JOHAL,      )
                )
      Plaintiff,  )
                )
   v.           )     02 C 8481
                )
LITTLE LADY FOODS, INC.  )     Judge Ronald A. Guzmán
                )
      Defendant.  )

*DOCKETED*
*JUL 3 0 2004*

## MEMORANDUM OPINION AND ORDER

Plaintiff Robin Johal has sued Little Lady Foods, Inc. for sex, color, race, national origin and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*. ("ADEA"). Defendant has moved for summary judgment and has moved to strike Plaintiff's Exhibit C, several paragraphs and sub-exhibit A from Plaintiff's Exhibit D, several paragraphs from Plaintiff's Local Rule 56.1(b)(3)(A) and Local Rule 56.1(b)(3)(B) submissions, and several statements in Plaintiff's response brief. For the reasons provided in this Memorandum Opinion and Order, the Court: (1) grants in part and denies in part the motion to strike Plaintiff's Exhibit C and paragraphs 13-14 and 35-45 of Plaintiff's Local Rule 56.1(b)(3)(B) Statement; (2) grants the motion to strike numerous paragraphs from Plaintiff's Local Rule 56.1(b)(3)(A) submission; (3) grants in part and denies in part the motion to strike numerous paragraphs from Plaintiff's Local Rule 56.1(b)(3)(B) submission; (4) grants in part and denies in part the motion to strike several paragraphs and sub-exhibit A from Plaintiff's Exhibit D; and (5) grants the motion to strike all additional statements of fact in Plaintiff's response brief that are unsupported by evidence in the record. The Court grants Defendant's

motion for summary judgment.

## FACTS

Unless otherwise noted, the following facts are either undisputed or deemed admitted because the party's response failed to comply with Local Rule 56.1, which this Court strictly enforces. The following section does not include any fact that was unsupported by the proponent's citation to the record.

Plaintiff Robin Johal is a fifty-year-old Asian woman, who was born in India and emigrated to the United States with her family when she was a teenager. (Pl.'s LR 56.1(b)(3)(B) ¶ 1; Def.'s Ex. U, First Am. Compl. ¶ 5.) In 1977, she graduated from the University of Washington with a degree in food science technology. (Pl.'s LR 56.1(b)(3)(B) ¶ 2; Pl.'s Ex. A, Johal Aff. ¶ 6.) Although Johal speaks English fluently, her accent indicates that she was born outside the United States. (Pl.'s LR 56.1(b)(3)(B) ¶ 3.)

Little Lady Foods, Inc. hired Johal in August 1992 as Manager of Quality Assurance. (*Id.* ¶ 48.) She was hired to set up a quality assurance program for the company. (Def.'s LR 56.1(a)(3) ¶ 9.) In 1992, Little Lady Foods had sales of less than $10 million. (*Id.* ¶ 10.) The company primarily manufactured pizza crusts and pizza for Bravissimo, their own pizza line. (*Id.* ¶ 11.) At the time Johal was hired, Little Lady Foods did not have a Quality Assurance department, but it did have a Research and Development department that reported to John Geocaris, the company's president. (Def.'s LR 56.1(a)(3) ¶¶ 12-13.)

Johal reported to Robert Gannett, Vice President of Operations, from the time she was hired until April 10, 2000, when Gannett left the company. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 57, 68.) When Johal started working at Little Lady Foods, Gina Harper, a Caucasian woman in her late

2

twenties, held the highest rank in the company's Research and Development department and reported to John Geocaris. (*Id.* ¶ 49.) During most of the 1990s, John Geocaris acted as the Manager of Research and Development. (*Id.* ¶ 24.) Harper left Little Lady Foods in the summer of 1993, at which time Johal assumed Harper's duties as the lead research and development person, in addition to those of her own position as Manager of Quality Assurance. (*Id.* ¶¶ 49-50.) The responsibilities associated with the two positions differed. (*Id.* ¶ 15; Def.'s Ex. B, Johal Dep. at 83.) The Research and Development department was responsible for developing products and setting up initial specifications; whereas, the Quality Assurance department finalized production specifications and implemented production. (Def.'s LR 56.1(a)(3) ¶¶ 16-17; Def.'s Ex. B, Johal Dep. at 83-84.)

Johal held both positions for approximately two years until the summer of 1995 when Little Lady Foods hired Elizabeth Johnson to take over the research and development function. (Pl.'s LR 56.1(b)(3)(B) ¶ 50.) Johnson was a Caucasian woman in her late twenties and reported to John Geocaris. (*Id.* ¶ 51.) When Johnson left Little Lady Foods in the summer of 1996, Johal again performed the research and development function for about two and a half years along with the duties of the Manager of Quality Assurance position. (*Id.* ¶ 52.) At the end of 1997, the company hired Jennifer Balanoff, a Caucasian woman in her mid-thirties, to take over the lead research and development function. (*Id.* ¶ 53.) Balanoff reported to John Geocaris. (*Id.*) She left Little Lady Foods at the end of 1998, and Johal once again took over the lead research and development position in addition to acting as Manager of Quality Assurance, this time for sixteen months until April 2000. (*Id.* ¶¶ 53, 54.)

In March 2000, Little Lady Foods hired Kevin O'Rourke to replace Robert Gannett as Vice President of Operations. (Def.'s LR 56.1(a)(3) ¶¶ 23, 24.) This action prompted changes

in the company's reporting structure. (*Id.* ¶ 24.) In April 2000, Little Lady Foods decided to separate Quality Assurance and Research and Development into two separate departments, each with its own manager, to accommodate the company's changing needs and continued growth. (*Id.* ¶¶ 25 - 26.) Shortly after this decision was made, Johal was informed of the reorganization at a meeting with John Geocaris and Daniel Geocaris, the Vice President of Sales and Marketing. (*Id.* ¶ 27; Pl.'s LR 56.1(b)(3)(B) ¶ 58.)[1] At the meeting, John Geocaris offered Johal the choice of managing either the Quality Assurance department or the Research and Development department. (Pl.'s LR 56.1(b)(3)(B) ¶ 59.) Johal chose to accept the Research and Development position and started in that position about two weeks later. (Def.'s LR 56.1(a)(3) ¶ 30.) In the summer of 2000, Little Lady Foods hired Elisa Loconte to manage the Quality Assurance department. (*Id.* ¶ 31; Pl.'s Ex. B, Sub-ex. 9, Loconte Resumé.)

In her new position, Johal reported to Daniel Geocaris. (Def.'s LR 56.1(a)(3) ¶ 32.) As manager of Research and Development, Johal was responsible for working with customers and other departments within the company to develop new products and for resourcing raw materials. (*Id.* ¶¶ 33 - 34.) She was also responsible for developing acceptable product prototypes for customers. (*Id.* ¶ 35.) Moreover, she managed one or two assistants. (*Id.* ¶ 36.)

In July 2000, Little Lady Foods began negotiations with HJ Heinz to manufacture its Weight Watchers SmartOnes Pizza line. (Pl.'s LR 56.1(b)(3)(B) ¶ 79.) Heinz's total food sales volume exceeded that of any of Little Lady Foods' other customers and the SmartOnes line had the potential to become the company's leading sales product. (*Id.* ¶ 80.) Heinz was also the

---

[1]There is some question as to whether O'Rourke attended that meeting as well. Johal maintains that he did; O'Rourke, and both Geocaris brothers state that he did not. (Pl.'s LR 56.1(b)(3)(B) ¶ 58; Def.'s LR 56.1(a)(3) ¶ 27.)

most complex customer Little Lady Foods had in 2001. (Def.'s LR 56.1(a)(3) ¶ 66.) The account required the production of five different pizzas. (*Id.* ¶ 67.) Because SmartOnes Pizza was a dietary product, Heinz had its own culinary team in San Francisco develop the recipes. (*Id.* ¶ 70.)

Johal, John Geocaris, and members of the sales department met with Heinz representatives to discuss production of the pizza line. (Def.'s LR 56.1(a)(3) ¶ 39.) Johal began the research and development work for SmartOnes in August 2000. (Pl.'s LR 56.1(b)(3)(B) ¶ 81.) By the end of December 2000, she located a source for supplying the product's crust that Heinz found acceptable. (*Id.* ¶ 85.) The first sales of the product occurred in March 2001. (*Id.* ¶ 68.)

After Johal took over as manager of Research and Development, Little Lady Foods began to receive complaints from customers about her performance, and the company's internal sales associates began to complain that she lacked the technical knowledge necessary for product development. (Def.'s LR 56.1(a)(3) ¶ 41.) These complaints started in April 2000 and continued through July 2001. (*Id.* ¶ 74.) Specifically, Susan Kay, the Product Development Specialist for Heinz who worked with Johal on product development, complained that Johal was unable to follow directions, lacked good judgment, and failed to check her work. (*Id.* ¶¶ 75-77.)[2] Daniel Geocaris met with Johal to discuss these complaints. (*Id.* ¶ 44.) Her performance review from August 29, 2000 indicated that she had done a nice job with Heinz but also noted areas of deficiency. (*Id.* ¶ 46.) The review contained the phrase "Excellent Job!" in reference to Johal's

---

[2]Johal appears to deny some of these statements in her response to Defendant's LR 56.1(a)(3) statement of material facts, but she fails to cite to the record in support of her denial. As such, this Court deems such statements admitted. Further, these statements are not hearsay because John Geocaris testified that he has personal knowledge of the complaints about Johal.

work with Heinz. (*Id.* ¶¶ 47, 48.) It also stated that Johal had done a "nice job with Heinz, Leona's, Pancake Café, etc." (Pl.'s LR 56.1(b)(3)(B) ¶ 88.) Johal's January 18, 2001 performance review stated that she needed to improve her technical knowledge, "show more creativity with recipes when necessary," and "develop a rapport with all managers." (Def.'s LR 56.1(a)(3) ¶¶ 49-51.) This review authorized payment of a $5,704 bonus, which included a $1,000 Heinz Special Extra Bonus. (Pl.'s LR 56.1(b)(3)(B) ¶ 87.)[3]

Elisa Loconte, the manager of Quality Assurance, experienced difficulties working with the Heinz team on the SmartOnes Pizza line. (*Id.* ¶ 89.) In mid-February 2001, Heinz informed Little Lady Foods that it would no longer work with Loconte and the company subsequently fired her. (*Id.*) John Geocaris then transferred management of the Quality Assurance department to Kevin O'Rourke, and Little Lady Foods hired Mohammed Allaudin as a consultant for the department. (*Id.* ¶ 90.) During this time, Johal continued to work on the SmartOnes Pizza team. (*Id.* ¶ 91.)

The acquisition of the Heinz SmartOnes Pizza account prompted Little Lady Foods to consider further reorganizing its Technical Services department to meet the more complex technical needs of sophisticated customers such as Heinz, as well as the increased technical requirements of the United States Department of Agriculture ("USDA"). (Def.'s LR 56.1(a)(3) ¶¶ 79, 80, 83.) Based on complaints it received from Heinz, Little Lady Foods decided to hire a person with the technical expertise necessary to supervise both the Quality Assurance and Research and Development departments. (*Id.* ¶ 81.) John and Daniel Geocaris discussed

---

[3]It is undisputed that the review authorized a bonus, but Little Lady Foods claims it froze Johal's salary for three months pending her improvement. (Def.'s Resp. Pl.'s LR 56.1(b)(3)(B) ¶ 87.)

creating a new position to oversee the two departments at the beginning of 2001. (*Id.* ¶ 84.) The reorganization of the Quality Assurance and Research and Development departments was also discussed at management meetings held while Little Lady Foods was in the midst of preparing the SmartOnes line for production. (*Id.* ¶ 85.) These discussions focused on what Little Lady Foods needed to do to meet the expectations of more demanding and technically advanced customers. (*Id.* ¶ 86.) In mid-February 2001, Johal was removed from the Executive Planning Committee and, after that time, was not privy to discussions about the company's strategic planning. (Pl.'s LR 56.1(b)(3)(B) ¶ 96.)

In April 2001, John Geocaris told Johal that the company had hired Paula Gerlat as the Director of Technical Services. (*Id.* ¶ 99.) Geocaris provided Johal with a copy of the job description for the Director of Technical Services and a copy of Gerlat's resume. (*Id.*) He told Johal that she would report to Gerlat as soon as Gerlat began work with Little Lady Foods. (*Id.*) Gerlat started work with the company on May 15, 2001. (*Id.* ¶ 102.) On May 25, 2001, Johal sent a memo to Daniel Geocaris asking him to clarify her job duties pursuant to the hiring of a Director of Technical Services. (*Id.* ¶ 105.) At about this time, John Geocaris began to receive complaints that Johal refused to acknowledge Gerlat as her supervisor and did not speak to her. (*Id.* ¶ 103.) John Geocaris also received complaints from internal sales representatives regarding Johal's unrealistic representations to customers. (*Id.* ¶ 104.)[4]

Gerlat's first responsibility during the initial six weeks of her employment was to resolve problems that Little Lady Foods had with the USDA, problems that had resulted in a week-long shut down in the pizza plant for meat production. (*Id.* ¶¶ 103-04.) This shut down resulted from

---

[4]Johal disputes the accuracy last two statements but does not cite to the record in her response to them, and accordingly this Court deems them admitted.

documentation failures that occurred during Loconte's tenure as Manager of Quality Assurance. (*Id.* ¶ 103.) During this period, Johal continued to work on ongoing research and development projects. (*Id.* ¶ 107.) The company's sales staff and customers contacted Johal directly about these projects. (*Id.* ¶ 108.)

After Gerlat was hired, Little Lady Foods began to focus on reorganizing the Research and Development department. (Def.'s LR 56.1(a)(3) ¶ 89.) The company determined that it needed to create a position in the department requiring formal culinary training so that it could meet the needs of its more sophisticated customers and continue to grow. (*Id.* ¶ 90.) At the time it acquired the Heinz account, Little Lady Foods neither had a corporate chef nor employed anyone with a culinary degree, and therefore had to outsource most of its culinary work to other companies. (*Id.* ¶ 91.)

In July 2001, Little Lady Foods decided to eliminate the position of Manager of Research and Development. (*Id.* ¶ 92.) The company's stated reasons for the elimination of the position included the increased sophistication of the company's customers, the increased technical requirements of the USDA, and the need for greater culinary skill. (*Id.* ¶ 93.)[5] John Geocaris anticipated that the head of Research and Development would need to have formal culinary training to interact with customers with more complicated needs, such as Heinz. (*Id.* ¶ 94.) Moreover, this person would no longer be as responsible for the technical aspects of the job but would focus instead on product and sample development. (*Id.* ¶¶ 95, 97.) To accomplish these goals, the company determined that it needed to have a corporate chef manage the Research and

---

[5] Johal denies that the position of Research and Development manager was eliminated but fails to cite to the record. (*See* Pl.'s LR 56.1(b)(3)(A) ¶¶ 92-93.) Accordingly, the Court deems admitted paragraphs 92 and 93 of Defendant's statement of facts.

Development department. (*Id.* ¶ 98.) The more technical aspects of the job would become the responsibility of the Director of Technical Services. (*Id.* ¶ 96.) Thus, the former responsibilities of the Research and Development manager would be redistributed among the newly created position of Corporate Chef, the Director of Technical Services, and the Lead Research and Development Technician. (*Id.* ¶ 99.) The Research and Development portion of the job description for Director of Technical Services was nearly identical to that of Manager of Research and Development. (Pl.'s LR 56.1(b)(3)(B) ¶ 165.)

John Geocaris decided to discharge Johal in July 2001 based on her job performance, the reorganization of the Research and Development department, and the elimination of her current position. (Def.'s LR 56.1(a)(3) ¶ 110.) On July 13, 2001, he informed Johal that her employment with Little Lady Foods was being terminated. (Pl.'s LR 56.1(b)(3)(B) ¶ 109.) Geocaris offered Johal a severance package with a total value of $42,144.65, which included six months of severance pay, but Johal turned it down. (Def.'s Ex. B, Johal Dep. at 257-58.)[6] Upon termination, Johal received payment for accrued vacation, bonuses through July 2001, and the value of 6,667 of the 10,000 stock appreciation rights (SARs) she received from the company. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 111-12.) Johal had received the SARs effective January 1, 1999. (*Id.* ¶ 112.) They vested as follows: 3,333 on December 31, 1999; 3,334 on December 31, 2000; and 3,333 December 31, 2001. (*Id.*) At the time she was discharged, her 6,667 vested SARs were automatically exercised; the 3,333 unvested SARs were forfeited. (*Id.* ¶ 113.) John Geocaris set the value on the SARs. (*Id.* ¶ 111.)

_____

[6]In her LR 56.1(b)(3)(B) statement, Johal stated that she was fired without severance pay; however, in her deposition, she testified that she was offered a severance package but refused it. (Pl.'s LR 56.1(b)(3)(B) ¶ 109; Def.'s Ex. B, Johal Dep. at 257-58.)

Little Lady Foods established its Stock Appreciation Rights Plan on March 1, 1993. (*Id.* ¶ 126.) At that time, the company awarded 50,000 SARs apiece to Roger Williams, the Vice President of Finance; Robert Gannett, the Vice President of Operations; Daniel Geocaris, the Vice President for Sales and Marketing; Michael Eisel, the Plant Manager; and Richard Madsen.[7] (*Id.* ¶¶ 127-32.) All of these men are Caucasian. (*Id.* ¶¶ 128-32.) On February 13, 1996, Little Lady Foods awarded 25,000 SARs apiece to Roxanne Orman, the company's comptroller; Larry Linnet, the Sales Manager; Peter Cokinos, the Director of Sales; and George Cohn, the Purchasing Manager. (*Id.* ¶¶ 134-37.) Each of these awards was subject to an addendum that limited the value of the SARs. (*Id.* ¶ 134.) Orman, Linnett, and Cokinos are Caucasian; Cohn is African-American. (*Id.* ¶¶ 135-37.)

On January 1, 1999, the company awarded 10,000 SARs each to Johal; Orman; Madeline Gonzalez, the Plant Manager; James Burnett, the Warehouse Manager; and Carlos Pineiro, the Sanitation Manager. (*Id.* ¶¶ 139-46.) Another 75,000 SARs were awarded to Daniel Geocaris. (*Id.* ¶ 139.) Burnett is African-American; Gonzalez and Pineiro are Hispanic. (*Id.* ¶¶ 142, 144, 146.) Sometime in 2000, Little Lady Foods awarded 150,000 SARs each to Kevin O'Rourke, the Vice President of Operations, and Thomas Scott, the Vice President of Administration. (*Id.* ¶¶ 148-50.) Both men are Caucasian. (*Id.* ¶¶ 149-50.)

The Stock Appreciation Rights Plan provided a formula to determine the fair market value of the SARs, and allowed for appeal if the employee did not agree with that valuation. (*Id.* ¶ 153.) However, under the 1996 addendum, the employee was bound by the valuation of the stock and could not appeal. (*Id.* ¶ 154.) The Plan provided for payout in three installments,

---

[7]The parties dispute Madsen's job title.

whereas the addendum permitted payment in one lump sum. (*Id.* ¶¶ 155-56.) The Plan provided

that an employee who died or was terminated employment forfeited all SARs if the employee

was not at least fifty percent vested. (*Id.* ¶ 157.) The addendum permitted the employee to

receive all vested SARs on death or termination. (*Id.* ¶ 158.) Moreover, the Plan provided that

if the company terminated an employee for reason other than cause, the employee would be one

hundred percent vested. (*Id.* ¶ 159.) The addendum, on the other hand, provided that on

termination, the employee was entitled to only the vested interest. (*Id.* ¶ 160.) The Plan was

therefore more valuable to the employee because it granted a right to appeal the SARs' valuation

and because it provided one hundred percent vesting if an employee was terminated for reason

other than cause. (*Id.* ¶ 161.)

After Johal was discharged, the responsibilities of the Manager of Research and

Development were split between Paula Gerlat, the Director of Technical Services, and Elizabeth

Valezquez, the lead Research and Development technician. (Def.'s LR 56.1(a)(3) ¶ 119.) In the

third or fourth quarter of 2001, Little Lady Foods hired Nikol Bava as its Corporate Chef. (*Id.* ¶

120.) Bava also supervised the Research and Development technicians. (*Id.* ¶ 120.) Bava

received an A.A.S. degree in Culinary Arts from Joliet Junior College in 2001 and prior to 1999,

she worked outside the food industry. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 9-10.) In early 2000, Bava was

replaced by Sue Ashton Becker. (Def.'s LR 56.1(a)(3) ¶ 121.) Becker was over the age of forty.

(*Id.* ¶ 122.) In March 2002, Little Lady Foods eliminated the Director of Technical Services

position, and hired Eric Johannsen as Vice President of Technical Services. (*Id.* ¶ 124.)

Johannsen was also over forty years old. (*Id.* ¶ 125.) The statements of fact are devoid of the

following information: (1) the race, color, national origin, or age of Gerlat, Valezquez, or Bava;

(2) the race, color, or national origin of Becker or Johannsen.

Johal's reliance on her testimony regarding statements made to her by other employees that they heard Kevin O'Rourke make several comments about Asians and workers under Robert Gannett, who happened to be African-American and Hispanic, is inadmissible hearsay. It is undisputed that O'Rourke was not involved in the decision to discharge Johal or eliminate the Manager of Research and Development position. (*Id.* ¶¶ 115-16.) At management meetings, he did participate in discussions about reorganizing the Quality Assurance and Research and Development departments. (*Id.* ¶ 117.) These discussions focused not on specific jobs or individuals, but on what needed to be done to take Little Lady Foods from a $25 million dollar company to a $45 million dollar one, as this is what had occurred within a year of Little Lady Foods' acquiring the Heinz account. (*Id.* ¶ 118.)[8]

In May 2002, Johal filed a charge with the Equal Opportunity Employment Commission ("EEOC") alleging discrimination based on race, color, national origin, sex, religion, and age. (*Id.* ¶ 141.) On November 21, 2002, Johal filed her Complaint alleging race, national origin, color, sex, and religious discrimination. On June 11, 2003, she filed an amended Complaint alleging race, color, national origin, age and sex discrimination. (*Id.* ¶ 147.)

## DISCUSSION

### I. Motions to Strike

First, Defendant moves to strike paragraphs 13-14 and 35-45 from the Plaintiff's Statement of Additional Facts on the grounds that the exhibits contained in the Plaintiff's

---

[8]Johal admits ¶¶ 115-18 of Def.'s LR 56.1(a)(3) Statement, *i.e.*, she admits O'Rourke was not involved in the decision to eliminate her position. Nothing in the record shows the exact level of O'Rourke's participation in the management meetings.

Appendix of Exhibits, specifically Exhibit C, do not represent admissible evidence. Defendant

relies on this Court's previous ruling at a hearing on July 8, 2003 that Defendant was required to

provide Plaintiff with the names of Little Lady Foods' officers and directors. (Hr'g Tr. of

7/8/2003 at 12-14.) Defendant claims Plaintiff has attempted to circumvent this Court's order by

also obtaining the minutes of shareholder meetings through a request as a shareholder. Upon

review of the hearing transcript, the Court notes that although the parties raised the issue whether

the minutes of shareholder meetings were subject to discovery, the issue was not discussed

substantively. Further, the motion to strike does not sufficiently address paragraphs 44 and 45

that do not rely on Exhibit C and instead rely on Exhibit B. Accordingly, the Court denies

Defendant's motion to strike paragraphs 13-14 and 35-45 of Plaintiff's LR 56.1(b)(3)(B)

Statement.

Second, Defendant moves to strike, for failure to comply with Local Rule 56.1(b)(3)(A),

several paragraphs from Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Facts.

Local Rule 56.1(b)(3)(A) requires that a response to a motion for summary judgment contain "a

response to each numbered paragraph in the moving party's statement, including, in the case of

disagreement, specific references to the affidavits, part of the record, and other supporting

materials relied upon." The Seventh Circuit has stated numerous times that "district courts are

not obliged in our adversary system to scour the record looking for factual disputes." *Waldridge

v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). When the non-moving party fails to

adhere to the local rules that require a response to the moving party's statement of facts,

supported by appropriate citations to the record, the moving party's facts remain uncontested.

*World Impressions, Inc. v. McDonald's Corp.*, 235 F. Supp. 2d 831, 834 (N.D. Ill. 2002). The

district court may strike those responses by the nonmovant that do not comply with the local

rule. *Id.* After reviewing Plaintiff's responses to Defendant's statement of undisputed facts, the Court agrees with Defendant that the following paragraphs of Plaintiff's response do not comply with Local Rule 56.1(b)(3)(A), as these responses deny the asserted facts but fail to support the denials with specific and accurate references to the record, affidavit, or other supporting material: 40-43, 63, 70, 73, 75-78, 87, 90-94, 98, 100, 102-04, 110, 127, 129, and 131-32. These responses are stricken, and the facts Defendant asserted in those paragraphs are deemed admitted. Moreover, Plaintiff did not respond at all to paragraphs 88 and 89, therefore both paragraphs are also deemed admitted.

Third, Defendant moves to strike several paragraphs in Plaintiff's Statement of Additional Facts because they are argumentative, non-responsive, or legal conclusions. Other paragraphs allegedly lack evidentiary support in the form of citations to the record. Local Rule 56.1(b)(3)(B) requires the nonmovant to set forth, in short numbered paragraphs, facts that require the denial of summary judgment and to support these facts by specific references to the record. LR 56.1(b)(3)(B); *see Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). The following paragraphs in the Plaintiff's Statement of Additional Facts lack any citation to the record and are therefore stricken: 12, 133, 138, 140, 147, 163, and 164. As for the remaining paragraphs Defendant asks to have stricken, the Court is fully capable of examining the parties' factual statements to determine which facts should be considered and which should not. *See Ogborn v. United Food & Commercial Workers, Local No. 881*, No. 98 C 4623, 2000 WL 1409855, at *3 (N.D. Ill. Sept. 25, 2000) ("[T]o the extent any factual assertion has been inadequately or improperly supported, such assertions will not be incorporated into the facts taken to be true for purposes of [summary judgment] . . . .").

Fourth, Defendant moves to strike paragraphs 27-28 and 31 from Plaintiff's Exhibit D,

the affidavit of Robert Gannett, the former Vice President of Operations for Little Lady Foods. Defendant argues that these paragraphs are irrelevant. The Court disagrees and finds them remotely relevant to the issue of pretext. In the alternative, Defendant has responded to each individual paragraph that cites to Gannett's affidavit, and such responses will be considered in the usual course.

Defendant also moves to strike Sub-exhibit A, submitted with Gannett's affidavit, and the portion of paragraph 32 of Gannett's affidavit that quotes Sub-exhibit A for failure to lay the appropriate foundation of a business record pursuant to Federal Rule of Evidence 803(6). In order to be "admissible as business records under Fed. R. Evid. 803(6) . . . a proper foundation [must be laid] as to the reliability of the records." *Collins v. D.J. Kibort*, 143 F.3d 331, 337 (7th Cir. 1998). "A proper foundation is established if the party attempting to admit the evidence demonstrates that the business records 'are kept in the course of regularly conducted business activity, and [that it] was the regular practice of that business activity to make records, as shown by the testimony of the custodian or otherwise qualified witness.'" *Id.* (quoting *United States v. Briscoe*, 896 F.2d 1476, 1494 (7th Cir. 1990)) (internal quotations omitted). Plaintiff's Sub-Exhibit A is a memorandum dated April 10, 2000 and sent by John Geocaris to all employees of Little Lady Foods' employees that describes changes in the company's management structure. (Pl.'s Ex. C, Sub-ex. A, ¶ 32.) Plaintiff has made no effort to demonstrate that the memorandum is admissible under the business records exception or any other exception to the hearsay rule. Given that Plaintiff has failed to establish the proper foundation, the Court grants Defendant's motion to strike Sub-exhibit A and that portion of paragraph 32 that quotes Sub-exhibit A.

Finally, Defendant moves to strike additional facts Plaintiff presented solely in her brief in response to its Motion for Summary Judgment because Plaintiff failed to cite to any part of the

15

record. The submissions pursuant to the Local Rule regarding summary judgment provide the only acceptable means of disputing the other party's facts and presenting additional facts to the district court. *See World Impressions*, 235 F. Supp. 2d at 835. It is not sufficient to provide the Court with additional facts in one's responsive memorandum. *Malec*, 191 F.R.D. at 584. The Seventh Circuit has "consistently and repeatedly required strict compliance" with the Local Rule regarding summary judgment. *Id.* (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316-17 (7th Cir. 1995)). Therefore, the Court will not consider any additional facts presented in the Plaintiff's brief that were not originally presented in her LR 56.1(b)(3)(A) or LR 56.1(b)(3)(B) Statement.

## II. Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), the Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering evidence submitted by the parties, the court does not weigh it or determine the truth of asserted matters. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All facts must be viewed and reasonable inferences drawn in the light most favorable to the non-moving party. *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). "If no reasonable jury could find for the party opposing the motion, it must be granted." *Hedberg v. Ind. Bell Tel. Co., Inc.* 47 F.3d 928, 931 (7th Cir. 1995).

Defendant moves for summary judgment because Plaintiff has failed to create a genuine issue as to a material fact regarding her age, color, national origin, race, and sex discrimination

16

claims. Title VII prohibits employers from discriminating against an employee based on race, color, religion, sex, or national origin.[9] 42 U.S.C. § 2000e-2(a)(1). Likewise, the ADEA makes it unlawful "to fail to or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." #29 U.S.C. § 623(a)(1). The burden is on the plaintiff to prove intentional discrimination by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Plaintiffs can make out their discrimination claims through either the direct or indirect method. *Huff v. UARCO Inc.*, 122 F.3d 374, 380 (7th Cir. 1997). Under the direct method, the plaintiff must show that the defendant or its agents acknowledge discriminatory intent or that circumstantial evidence permits an inference of discrimination on the employer's part. *Id.* The Seventh Circuit Court of Appeals has distinguished three types of circumstantial evidence from which such inferences can be drawn. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group," and other similar types of evidence from which the court could draw a reasonable inference of discriminatory animus. *Id.* The second is evidence that employees who were similarly situated to the plaintiff but not members of the protected class received systematically better treatment. *Id.* Finally, the third is evidence that the plaintiff was qualified for the job but was replaced by someone outside the protected class, and that the employer's reason for the treatment is mere pretext for discrimination. *Id.*

---

[9]"Because Johal is from India and "people of the Indian subcontinent are Caucasians," the appropriate claim is one for national origin and color discrimination, not race discrimination. *Dasgupta v. Univ. of Wisc. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997); *see Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1308 (7th Cir. 1989) (stating that claim of employee of Indian ancestry who was not promoted "is more accurately described as a charge of discrimination based on color, ethnicity, or national origin, rather than race, since Indians are Caucasians.")

Plaintiffs may also satisfy their burden of proof by using the indirect, burden-shifting method set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this approach, Johal must first establish a *prima facie* case of discrimination by the proving that (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she was subject to a materially adverse employment action; and (4) other employees who were similarly situated but outside of the protected class were treated more favorably. *See id.* at 802; *St. Mary's*, 509 U.S. at 506.

Given that both parties agree that the events leading to Johal's discharge are consistent with the mini-reduction in force ("mini-RIF") situation described in *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687 (7th Cir. 2000), the typical fourth prong of *McDonnell Douglas* test does not apply here. Instead, Johal must show that her job duties were absorbed by employees who were not members of her protected class. *Id.* at 693. Should Johal establish a successful *prima facie* case, the burden of production then shifts to Little Lady Foods to show a legitimate, non-discriminatory reason for its actions. *Id.* If Little Lady Foods can establish a legitimate, non-discriminatory reason, the burden then shifts back to Johal to show that Little Lady Foods' stated reason is pretextual. *Id.* However, the ultimate burden of proving intentional discrimination rests at all times with the plaintiff. *Id.*

## A. Direct Method

Johal attempts to show through circumstantial evidence that Little Lady Foods intentionally discriminated against her on the basis of race, color, national origin, and sex. The main elements of her argument are as follows: (1) John Geocaris, the president of Little Lady Foods, deliberately avoided supervising employees who were members of minority groups; (2)

18

her work was satisfactory and that she had acted as *de facto* manager of the Department of Technical Services prior to that position being created; (3) a statistical analysis of minority employees who held positions of manager and above at Little Lady Foods shows the number of minority employees dropped dramatically after April 2000; (4) rewards of SARs under the company's Stock Appreciation Rights Plan went disproportionately to Caucasian employees; and (5) inconsistencies in the testimony of John Geocaris call into question his credibility in a manner that can only be resolved by a jury.

In her memorandum in opposition to the motion for summary judgment, Johal asserts that John Geocaris consciously avoided having an employee who was a member of a minority group report to him.[10] She cites to the undisputed facts that, during her first several years at Little Lady Foods, when she filled the position of Manager of Quality Assurance, the three individuals to lead research and development were female Caucasians in their late twenties or early thirties, and that each of these women reported to John Geocaris. (*See* Pl.'s LR 56.1(b)(3)(B) ¶¶ 50, 51, 53.) However, during the periods between 1992 and 1998, when the company did not have a leader of research and development, Johal took on that position in addition to managing the Quality Assurance department and worked with Geocaris although she did not report to him directly. (*Id.* ¶¶ 50, 52, 54.) Johal also notes that Geocaris turned supervision of the Quality Assurance department over to Kevin O'Rourke after Elisa Loconte, a Caucasian, was fired in February 2001, at which point O'Rourke hired an Asian-American consultant, Mohammed Allaudin to head the department. (*Id.* ¶ 90.) Taken together, these few facts do not create a reasonable inference that John Geocaris consciously or systematically

---

[10]Plaintiff frequently failed to cite to the record in her memorandum. She also provides only limited citations to case law to support her legal propositions.

discriminated against minority employees. Johal fails to provide any evidence that Geocaris'
decision not to supervise the Research and Development department had anything to do with the
race of the person heading it. As such, Johal's contention is speculative at best and cannot
withstand summary judgment.

Johal further asserts that she acted as the *de facto* manager of Technical Services during
the periods between August 1992 and April 2000 when she performed the duties of both the
manager of Quality Assurance and head of Research and Development. She cites to her own
assessment of her performance and the positive reviews she received from Robert Gannett to
imply that she was meeting her employer's legitimate expectations when they terminated her.
(Pl.'s LR 56.1(b)(3)(B) ¶ 54.) The Seventh Circuit has consistently ruled that an employee's
self-interested assessment of her own work performance is insufficient to establish
circumstantial evidence of discrimination. *See, e.g., Mills v. First Fed. Sav. & Loan Ass'n of
Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996); *Gustovich v. AT & T Communications, Inc.*, 972
F.2d 845, 848 (7th Cir. 1992) ("An employee's self-serving statements about his ability . . . are
insufficient to contradict an employer's negative assessment of that ability."); *Williams v.
Williams Elecs., Inc.*, 856 F.2d 920, 924 (7th Cir. 1988) (employee's self-interested assessment
of her own job abilities is insufficient to raise an issue of fact for trial).

Likewise, Gannett's assessment of Johal's performance is not probative of her
performance at the time of her discharge because he left the company in April 2000, more than a
year before Johal was terminated. The case law does not lend much support for statements by
former supervisors that generally corroborate a plaintiff's own perception of her abilities. *See,
e.g., Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124- 25 (7th Cir. 1994) (affidavit of
former supervisor that plaintiff's performance was satisfactory and that admitted mishaps were

not entirely his fault insufficient to defeat summary judgment); *Williams*, 856 F.2d at 924 (former supervisor's general statements about plaintiff's abilities did not establish that employer had not genuinely considered plaintiff's performance in making its layoff decision). In sum, Johal's own and Gannett's assessments of her abilities do not create a genuine issue as to a material fact regarding whether she was meeting Little Lady Foods' legitimate expectations at the time of her termination.

Johal next asserts that statistical evidence regarding a decrease in the number of minority managers at Little Lady Foods provides circumstantial evidence of discrimination. She states that on April 10, 2000, five of the six managers who reported to Robert Gannett, Vice President of Operations, were non-Caucasian. (Pl.'s LR 56.1(b)(3)(B) ¶ 61.) She states that as of July 30, 2003, Defendant employed a total of six managers, two of whom were Hispanic and four of whom were Caucasian. (*Id.* ¶ 44.) Even reading all disputed facts in her favor, as the Court must, this incomplete statistical data, however, is insufficient to survive summary judgment. To show disparate treatment between comparable individuals, Johal would not only need to include information about the national origin, color, age, and gender of the individuals involved in the personnel changes, but also the relative qualifications of such individuals. *See, e.g., Swanson v. Legett & Platt, Inc.* 154 F.3d 730, 734 (7th Cir. 1998) (data not considered probative because it does not contain the qualifications of the individuals retained, hired, or demoted); *Fisher v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140-41 (7th Cir. 1998) (statistical evidence not probative because it failed to rule out potential explanatory variables). Without information about the employees' relative qualifications, it is impossible to infer discriminatory intent from the data Johal provides. *See Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 967 (7th Cir. 1998) (chart showing ages of instructors granted and denied tenure not probative because it showed

instructors' ages but not their relative qualifications and, therefore plaintiff did not provide enough information from which to infer age bias).

Next, Johal argues that the manner in which the company distributed SARs provides circumstantial evidence of discriminatory intent. She notes that in 1993 and 2000, when the awards went only to Caucasians, they did not include addenda; whereas, in 1996 and 1999, when SARs went to minority as well as Caucasian recipients, they included addenda that reduced their value. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 126-32, 134-37, 139, 141-46, 148-61.) However, as Johal herself points out, in 1993 and 2000, Little Lady Foods awarded SARs primarily to its officers, while in 1996 and 1999, the awards went primarily to managers and directors, who were at a lower level in the corporate hierarchy. (Pl.'s Br. at 8.) Again, the evidence Johal provides here is incomplete and, in the absence of any comparison of the qualifications of those employees awarded SARs or the rationale behind the addenda, it is insufficient to create a reasonable inference of discrimination.

Finally, Johal points to inconsistencies between John Geocaris' testimony and corporate documents, arguing that they create a question of credibility that should be resolved by a jury. First, Johal takes issue with the fact that John Geocaris testified that he discussed her discharge with Dan Geocaris and Ruth Gilman, then Vice President of Human Relations. She suggests that, given that Paula Gerlat was Director of the Technical Services Department, Gerlat also should have participated in the decision. Johal further speculates that because she was removed from the management committee in February 2001, because the job description of the Director of Technical Services included most of the duties of the Manager of Quality Assurance, and because Geocaris failed to consult with Gerlat regarding Johal's termination, he probably made his decision to discharge her in February 2001, rather than the June-July 2001 date to which he

22

testified in his deposition. (Pl.'s LR 56.1(b)(3)(B) ¶ 165.) Again, she offers no evidence to support this speculative argument.[11] Such facts, even if the Court assumes they are true for purposes of the instant motion, are irrelevant, as Johal does not dispute that John Geocaris, as president of Little Lady Foods, had the authority to modify a position's requirements or eliminate it completely to accommodate the company's changing needs. (*See* Def.'s LR 56.1 ¶¶ 95-96, 99-100.) Thus, the alleged timing of the decision to terminate Johal and the individuals with whom he chose to consult are immaterial and do not create an issue of material fact.

Second, Johal contends that John Geocaris incorrectly stated as two the number of elected officers the company had between 1995 and 2002. (Pl.'s App., Ex. F, Dep. of John Geocaris, 33.) The company actually elected four officers annually since 1995 and eight in 2002. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 35-43.) Johal states that this inconsistency is material to showing that she was victim of a glass ceiling effect at Little Lady Foods. We disagree, this inconsistency is immaterial as it does not speak to the issue of the case: whether Geocaris harbored a discriminatory intent in deciding to eliminate Johal's position. On the issue of the reorganization of the Research and Development department, Geocaris has not offered contradictory testimony between the time Johal was discharged and the time of his deposition. As such, this does not create an issue of material fact. *See Stalter v. Wal-Mart Stores, Inc.* 195 F.3d 285, 291 (7th Cir. 1999) (a question of fact exists where employer's story undergoes fundamental change between time it undertook adverse employment action and time of administrative proceeding); *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634 (7th Cir. 1996) (failure to express non-discriminatory explanation earlier despite several opportunities

---

[11] By frequently failing to cite to the record in her brief, Johal violates the spirit if not the letter of Local Rule 56.1.

to do so gives rise to inference that later expressed reason is pretextual); *Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991), *cert. denied*, 505 U.S. 1205, (1992) (when employer gives one reason at time of the adverse employment decision and at trial gives another reason unsupported by documentary evidence, jury could reasonably conclude that new reason was pretextual after-the-fact justification).

Finally, Johal contends that Geocaris testified at his deposition that the addenda to the company's SARs certificates applied to everyone and not just the employees who were awarded SARs in 1996 and 1999. (Pl.'s App. Ex. F, Dep. of John Geocaris, 73.) Johal asserts in her memorandum in opposition to the summary judgment motion that the SARs awarded on December 15, 2001 to Kevin O'Rourke and Thomas Scott, both Caucasian men, were granted without the addendum limiting their value. However, Johal in her brief fails to provide a citation to the record to support this assertion and fails to state this proposed fact (and thus did not cite the record in support) in either her LR 56.1(b)(3)(A) Statement or her LR 56.1(b)(3)(B) Statement. She also does not provide any additional information about their rank within the company or their qualifications that might support her claim that the awards to O'Rourke and Scott are evidence of impermissible discriminatory treatment under the SARs plan. As a result, she fails to create an issue as to a material fact regarding this purported inconsistency.

In sum, Johal argues that John Geocaris' alleged pattern of avoiding direct supervision of non-Caucasians, statistical data showing a sudden drop in the number of minorities holding positions of manager or above after April 2000, the different treatment of Caucasian and minority employees in the granting of SARs, and the conflicting testimony of Geocaris constitute circumstantial evidence from which a reasonable person could infer discriminatory intent. However, for the reasons discussed, even taken together, this evidence is insufficient to

24

establish a triable issue of fact regarding whether her termination was based on an illegal discriminatory animus.

## B. Indirect Method

To establish a *prima facie* case of discrimination in a mini-RIF situation, Johal must show that: (1) she is a member of a protected class; (2) she was performing the functions of her job satisfactorily; (3) she experienced a materially adverse employment action; and (4) her duties were absorbed by employees who were not members of the protected class. *Michas*, 209 F.3d at 693. Little Lady Foods concedes that Johal meets the first and third prongs of the test. As a woman born in India over the age of forty, Johal falls into several protected classes: sex, age, national origin, and color. Clearly, Johal's termination qualifies as a materially adverse employment action. Accordingly, the Court focuses on whether Johal's evidence has created a triable issue of material fact regarding the second and fourth prongs, *i.e.*, whether she was performing her job satisfactorily and whether her duties were substantially absorbed by individuals outside of the protected classes into which she falls.

Johal contends that the evidence shows she was satisfactorily performing her job in 2001. A written performance review dated January 28, 2001 indicated she had done a nice job with several accounts, including Heinz. (Pl.'s LR 56.1(b)(3)(B) ¶ 88.) The review authorized both a bonus of $4,704 and a $1,000 Extra Special Bonus for her work with the Heinz account. (*Id.* ¶ 87.) Moreover, Johal indicates that she received a $1,400 per annum raise as of January 1, 2001 and an additional $1,000 raise on April 1, 2001. (*Id.* ¶ 97.) In her memorandum in opposition to the summary judgment motion, Johal further argues that John Geocaris made no reference to her

performance at her exit interview and that the company paid her a bonus for the first six months of 2001. (Pl.'s Br. at 11.) However, she fails to cite to the record to support these two assertions and failed to provide such statements of fact in her either her LR 56.1(b)(3)(A) Statement or LR 56.1(b)(3)(B) Statement. (*Id.*) Finally, Johal notes that her personnel file contained no adverse information, but she likewise fails to offer any evidence for this assertion. (*Id.*)

Little Lady Foods maintains that Johal's performance was less than satisfactory and points to several negative comments in her performance review that indicate she needed to improve her technical knowledge, show more creativity with recipes, and develop better rapport with all managers. (Def.'s LR 56.1(a)(3) ¶¶ 49-51.) Little Lady Foods also claims that it froze Johal's salary for the first three months of 2001 until she improved her performance in deficient areas. (*Id.* ¶ 52.) Yet, Johal's pay stubs for the period appear to indicate that she received two pay increases. The record does not indicate why her pay increased during this period. Her pay record dated December 12, 2000 shows a regular pay rate of $2,023.08 or $52,600 per year; the record dated January 26, 2001 shows a regular pay rate of $2,076.98 or approximately $54,000 per year, a 2.6 percent increase; and, the record dated April 20, 2001 shows a regular pay rate of $2,115.38 or approximately $55,000 per year, a 1.8 percent increase. (Pl.'s App., Ex. A, Aff. of Robin Johal, Sub-ex. 2-4.)[12] Neither party presents any evidence as to whether these pay raises were above or below average for employees at Johal's level.

The receipt of bonuses and pay increases do not necessarily indicate that Johal was performing up to Little Lady Foods' expectations at the time of her termination in July 2001. What matters in a discriminatory discharge case is not the employee's past performance, but

---

[12]There is nothing in the Plaintiff's appendix to show whether she received the bonuses called for in her evaluation.

whether she was meeting the company's expectations at the time of her discharge. *See Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 452-53 (7th Cir. 1998); *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991) (the court must focus on plaintiff's performance at the time of his termination because "the fact that an individual may have been qualified in the past does not mean he is qualified at a later time."). The bonuses authorized in Johal's January 2001 performance review were for work she performed during the year 2000. Similarly, she apparently received pay increases in January and April of 2001, several months before she was terminated in July 2001. These increases are therefore not determinative of Johal's performance at the time she was discharged and, as such, do not by themselves raise a genuine issue of material fact.

Little Lady Foods cites as further evidence of Johal's unsatisfactory performance complaints it received from customers, including Heinz, regarding Johal's inability to adequately perform tasks associated with her position fulfilling the research and development and quality assurance function. (Def.'s LR 56.1 ¶¶ 73, 75-77.) Johal admits that Kevin O'Rourke, John Geocaris, Peter Cokinos, and Michael Eisel testified that they received such complaints, but she disputes their accuracy. However, she fails to cite to any portion of the record to dispute the accuracy of the complaints. Accordingly, these statements are deemed admitted. In particular, a representative from Heinz complained that Johal could not follow directions and that she failed to proof her work, which resulted in errors. (*Id.* ¶¶ 76-77.) Little Lady Foods states that as the company grew and took on more sophisticated customers, Johal's lack of technical proficiency became increasingly significant. (*Id.* ¶ 87.)[13]

_____

[13]Johal admits that John Geocaris testified that her lack of technical proficiency became more significant as the company grew but denies the accuracy of his perception. However, she

27

Finally, Little Lady Foods argues that Johal resisted the organizational changes the company made prior to her termination, a fact Johal admits. (Def.'s LR 56.1 ¶¶ 53-56.) Johal further admits that she told Mike Eisel she did not believe Gerlat was qualified to be Director of Technical Services and that she should have gotten the job. (*Id.* ¶ 56.) Johal was upset that the company was merging the departments again and that she would not be in charge. (*Id.* ¶ 58.) Little Lady Foods contends that Johal refused to acknowledge that Gerlat was her supervisor and that she needed to communicate with Gerlat. (*Id.* ¶ 61.) Both Dan Geocaris and Mike Eisel have testified that they warned Johal she was jeopardizing her job with the company by refusing to speak with Gerlat. (*Id.* ¶¶ 62-63.) Johal denies receiving warnings from either man but cites only to their testimony in making her denial. She claims that for the first six months of Gerlat's employment, Gerlat spent eighty percent of her time resolving Little Lady Foods' problems with the USDA, presumably limiting the time she had available to meet with Johal. (Pl.'s LR 56.1(b)(3)(B) ¶ 104.) This does not raise a genuine issue of material fact regarding whether Johal's refusal to speak to Gerlat was one of the reasons why Defendant found she was not satisfactorily meeting its legitimate expectations.

Johal's assessment of her own performance is likewise insufficient to raise a genuine issue of material fact. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996.) Moreover, job performance evaluations cannot, in and of themselves, show adequacy of performance at the time when the adverse employment action was taken. *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998). Such evaluations, standing alone, do not create a genuine issue of triable fact when there have been

---

fails to cite to the record to support her denial. Accordingly, this Court deems the statement to be admitted.

"substantial alterations in the employee's responsibilities and supervision in the intervening period." *Id.* With the creation of the Technical Services Department and the hiring of Paula Gerlat as its director, both Johal's job duties and her supervision changed significantly in the six month period between her review and her termination. Moreover, even by her own admission, Johal's review was not entirely positive; rather Dan Geocaris pointed out several areas where her performance required improvement. Johal does not dispute that there were complaints about her performance from Heinz or that she resisted the organizational changes occurring at the company; changes which management had determined were essential in order to adjust to their new, important and more sophisticated client. Finally, although the evidence indicates that Johal received two pay increases in the first six months of 2001, these increases do not show that Johal was performing to the company's satisfaction at the time of her discharge. Because Johal fails to raise any genuine issues of material fact as to whether she was performing her job to the company's satisfaction, the Court grants Defendant's motion for summary judgment as to this prong of the test.

Johal and Little Lady Foods also disagree as to whether Johal meets the fourth prong of the test laid out in *Michas* for mini-RIF situations, *i.e.*, whether her duties were substantially absorbed by employees who were not members of her protected class. *Michas*, 209 F.3d at 693-94. As Johal is alleging that Little Lady Foods discriminated against her on the basis of sex, age, national origin, and color, each of these classes will be addressed in turn.

As to the charge of sex discrimination, Johal's duties as Manager of Research and Development were initially absorbed in part by the Director of Technical Services position, which was held by a woman, Paula Gerlat. Her other duties were absorbed into the Corporate Chef position initially occupied by Nikol Bava and then by Sue Ashton Becker, both women.

29

Finally, the remainder of Johal's duties were absorbed by the lead Research and Development technician, Elizabeth Valezquez, also a woman. Because Johal cannot show that her duties were absorbed by individuals who fall outside the protected class of women, she fails to make a *prima facie* case for sex discrimination. The Court therefore grants Little Lady Foods' motion for summary judgment as to the sex discrimination claim.

Regarding the charge of age discrimination, Johal, who was fifty years old at the time of her termination, must establish that she would not have been terminated "but for" intentional age-based discrimination. *See Michas*, 209 F.3d at 692 (court will find an ADEA violation when plaintiff presents evidence that demonstrates age was determining factor in discharge decision). As such, she must present evidence that her job duties were substantially absorbed by individuals who were significantly younger than herself, although not necessarily outside the protected class of employees over the age of forty. *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1028 (7th Cir. 1998). The Court of Appeals for the Seventh Circuit considers a ten-year age difference to be "presumptively substantial." *Hoffmann v. Primedia Special Interest Publ'ns*, 217 F.3d 522, 524 (7th Cir. 2000) (citing *O'Connor v. Consol. Coin Operators Corp.*, 517 U.S. 308, 313 (1996)). Johal puts forth no evidence regarding the ages of the three women who initially absorbed her job duties. However, Sue Ashton Becker, who succeeded Nikol Bava as Corporate Chef is over the age of forty, as is Eric Johannsen who was hired as Vice President of Technical Services when Gerlat left the company. (Def.'s LR 56.1 ¶¶ 122, 125.) Given that Johal fails to present evidence to show that her duties were absorbed by individuals substantially younger than herself, she likewise fails to make a *prima facie* case for age discrimination. The Court therefore grants Little Lady Foods' motion for summary judgment with respect to Johal's age discrimination claims.

Johal devotes her brief to arguing that her termination resulted from discrimination based on national origin and color. Again, to establish a *prima facie* case of discrimination, she must show that her job duties were absorbed by individuals who fell outside of the protected classes of national origin or color. *Michas*, 209 F.3d at 693. Although Gerlat, who absorbed some of the duties, is white, Johal offers no evidence as to Gerlat's national origin. Bava is also white, but Johal does not offer any evidence as to her national origin. Finally, Valezquez is Hispanic, so she could potentially fall within the protected categories of national origin and color. Because Johal does not offer sufficient evidence to show that the bulk of her duties job was absorbed by individuals outside her protected category of national origin, the Court grants Little Lady Foods' motion for summary judgment as to this claim. Given that the two women who absorbed the bulk of Johal's job duties are not in a protected color category, Johal has met the fourth prong of the *Michas* test as to her color discrimination claim.

However, even if Johal could establish a *prima facie* case for discrimination based on color (or any of her other claims, for that matter), she must still show that Little Lady Foods' stated reasons for terminating her employment were but a pretext for color discrimination. *St. Mary's*, 509 U.S. at 506. That is, Johal must establish that Little Lady Foods did not honestly believe that it was necessary to reorganize its Research and Development department and subsequently eliminate her position. Unless Johal can show that the Defendant did not honestly believe its reasons for discharging her, she loses "even if the reasons are foolish or trivial or baseless." *Kariotis v. Navistar Int'l Transp. Co.*, 131 F.3d 672, 676 (7th Cir. 1997) (citing *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it

offers.")). Proving pretext requires Johal to show one of three things: (1) that Little Lady Foods' explanation had no basis in fact; (2) that the company's explanation was not the real reason for her termination; or (3) that the company's articulated reason did not justify her termination. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 652 (7th Cir. 2001). Johal must rebut each and every one of Little Lady Foods' reasons for her dismissal by presenting facts that tend to show its reasons are false, thereby either showing or implying that the real reason for her termination is impermissible discrimination. *See Kariotis*, 131 F.3d at 677.

Johal points to Little Lady Foods' various explanations for her termination as evidence of pretext, claiming that the company has offered three reasons for its action: (1) its elimination of the Research and Development Manager position; (2) Johal's inability to work with her supervisor Gerlat; and (3) deficiencies in her technical knowledge and in her dealings with customers. (Pl.'s Br. at 11.) Shifting and inconsistent explanations can provide a basis for finding pretext. *See Stalter v. Wal-Mart Stores*, 195 F.3d 285, 291 (7th Cir.1999) However, to show that Little Lady Foods' explanations for the elimination of her position are pretextual, Johal must first establish that the company's explanations are actually shifting and inconsistent. *Schuster v. Lucent Techs., Inc.* 327 F.3d 569, 577 (7th Cir. 2003).

Johal cites to the deposition testimony of John Geocaris, who stated that he was unaware of whether Johal had been warned about her unsatisfactory performance and then claimed that her deficiencies were not the primary reason for her termination. (Pl.'s App., Ex. F, Dep. of John Geocaris, at 95.) Rather, Geocaris said that Johal was discharged because her position was eliminated. (*Id.*) The company did not hire a new Research and Development manager upon Johal's departure. (*Id.*) Instead, it hired a Corporate Chef. Johal contends that growing

32

companies do not eliminate positions in Research and Development but offers no evidence in support of this proposition. Moreover, Johal does not dispute that Little Lady Foods was changing its organizational structure in response to the company's growth, the new and more sophisticated customers it had acquired, and the increased technical requirements of the USDA. Nor does Johal deny that Little Lady Foods subsequently hired a Corporate Chef who had formal culinary training to meet the demands of its new customers. She also does not dispute that she did not communicate with her new supervisor, Paula Gerlat. Finally, Johal does not dispute that Little Lady Foods received complaints from Heinz about her job performance. As such, Johal fails to show that Little Lady Foods discharged her for reasons other than the ones the company articulated: that the company's changing and more sophisticated customer base necessitated a reorganization of its Quality Assurance and Research and Development Departments to meet new needs; that the company chose to eliminate Johal's position based in part on customer complaints about her proficiency; and that she refused to speak to her new supervisor and openly resisted the organizational changes taking place as the company grew.

Johal also contends that the reasons stated for her termination are a pretext for discrimination because Little Lady Foods had previously used the elimination of a position as a means to avoid a potential claim for wrongful termination. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 119-23). She claims that Robert Gannett used this method in early 1992 to discharge George Balsamo, who held the Quality Assurance Manager position just prior to Johal's joining the company. (*Id.* ¶ 119.) That position remained vacant for six months until Johal was hired. (*Id.*) Johal asserts that John Geocaris used this method to discharge Gannett, a white male, and Gerlat, a white female, but offers no evidence to prove her assertion; nor does she provide evidence that the company wrongfully terminated either Gannett or Gerlat. Thus, the only evidence she offers that

33

Little Lady Foods cloaked wrongful terminations under the euphemism "elimination of position" relates to Gannett's decision to discharge Balsamo, whose color and national origin is unknown and who she admits was discharged for poor performance. (*See id.* ¶ 119.) As she cannot show that Balsamo's position was terminated for reason other than cause or that his dismissal was somehow linked to her own, Johal fails to prove that John Geocaris used the technique of eliminating positions as a pretext for discrimination. The incidents surrounding Balsamo's dismissal are therefore irrelevant to her dismissal. Accordingly, Johal fails to establish that Little Lady Foods used the elimination of her position as a pretext for racial discrimination.

Finally, Johal testified in her deposition that other employees told her that Kevin O'Rourke made several statements about Asians and workers who reported to Robert Gannett. (Def.'s LR 56.1 ¶¶ 126, 128, 130, 136.) Johal admits that none of these comments were made directly to her. (*Id.* ¶ 133.) These statements are inadmissible hearsay and cannot be used to defeat Defendant's summary judgment motion. Even if they were not hearsay, Johal must show that the comments were somehow related to the company's decision to discharge her. *See Ritter v. Hill 'N Dale Farm*, 231 F.3d 1039, 1044 (7th Cir. 2000); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000); *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1124 (7th Cir. 1998). Pretext is "not demonstrated by isolated statements unrelated to the employment decision at issue." *Ritter*, 231 F.3d at 1044.

It is well established that allegedly discriminatory comments issued by any one other than the person who made the termination decision are not sufficient to establish pretext. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 n.11 (7th Cir. 1997). Johal admits that O'Rourke played no role in the either the decision to eliminate the Research and Development position or the decision to discharge her. (Def.'s LR 56.1 ¶¶ 115-16.) Given that Geocaris, not O'Rourke, was the decision-maker, Johal cannot use O'Rourke's comments to show that Geocaris was lying about the real reasons for her discharge.

Johal likewise offers no evidence to show that O'Rourke's alleged comments influenced Geocaris' decision. The more tenuous the connection between the alleged comments and the adverse employment action, the less evidentiary value the comments hold. *Schuster*, 327 F.3d at 576; *see Huff*, 122 F.3d at 386 (noting that proximity in time to the alleged discrimination is an appropriate consideration when assessing probative value). As Johal fails to show evidence of any connection between O'Rourke's alleged comments and Geocaris's decision to terminate her, she cannot use them to show evidence of pretext.

Johal has failed to present evidence tending to establish that Little Lady Foods' articulated reasons for her discharge were false, that Little Lady Foods used the elimination of positions as a cover for wrongful terminations, or that there was any connection between the company's decision to discharge her and the discriminatory comments allegedly made by O'Rourke. As such, no material question of fact exists as to whether the reasons Little Lady Foods articulated for discharging Johal served as a pretext for discrimination. The Court therefore grants Little Lady Foods' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, this Court grants in part and denies in part Defendant's Motion

to Strike [doc. no. 36-1] and grants the Defendant's motion for summary judgment [23-1].

**SO ORDERED**                    **ENTERED:**    JUL 2 9 2004

**HON. RONALD A. GUZMAN**
**United States Judge**